**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

```
                                     :
CAPITOL FIRST CORPORATION, et al,    :
                                     :   CIVIL ACTION NO. 04-6439 (MLC)
      Plaintiffs,                    :
                                     :   MEMORANDUM OPINION
      v.                             :
                                     :
MICHAEL G. TODD, et al.,             :
                                     :
      Defendants.                    :
                                     :
```

**COOPER, District Judge**

 The defendants Michael G. Todd and Prescott Investment L.P. ("PILP") move to dismiss the second amended complaint filed by the plaintiffs, Capitol First Corporation ("Capitol First"), Boca First Capital LLLP ("BFC"), Howard Bloom, MB2002, LLC ("MB2002"), Highland Investments LLC ("HILLC"), and Boca Funding Group LLC ("BFGL"), for failure to state a claim upon which relief may be granted, under Federal Rule of Civil Procedure ("Rule") 12(b)(6). (Dkt. entry no. 60.)  The defendants David Ryan, Kirlin Securities Inc. ("KSI"), and Olde Monmouth Stock Transfer Co., Inc. ("OMS") and John Troster separately move to dismiss the second amended complaint for (1) failure to state a claim upon which relief may be granted, under Rule 12(b)(6), and (2) lack of subject matter jurisdiction, under Rule 12(b)(1).  (Dkt. entry nos. 61-64.)[1]  The Court will deny these separate motions.

---

[1] OMS and Troster also move to have the Court convert their motion into a motion for summary judgment.

**BACKGROUND**

Todd was the president, chief executive officer, chairman of the board of directors, and controlling shareholder of Capitol First, f/k/a Capitol Communities Corporation, which is a Nevada corporation with its principal place of business in Boca Raton, Florida.  (2d Am. Compl., at ¶¶ 1-3.)  Todd was also the sole managing partner of Granite Industries, LLC, the managing partner of PILP, a Nevada limited partnership.  (Id. at ¶ 4.)

Bloom, Kenneth Richardson, Todd, and PILP formed BFC, a Florida limited liability limited partnership, in or around April 2002.  (Id. at ¶ 2.)[2]  MB2002, HILLC, and BFGL, all Florida limited liability companies, are successors in interest to part of Richardson's interest in — and are limited partners of — BFC. (Id.)  The general partner in BFC is Addison Capital Group, LLC ("ACG"), a Nevada limited liability company with a principal place of business in Boca Raton, Florida.  (Id.)

Todd, allegedly while under significant financial pressure on or around October 15, 2001, executed a promissory note ("Note") in favor of Capitol First for $300,000 in exchange for 6 million restricted shares of Capitol First stock.  (Id. at ¶ 15.)  The Note was to become due and payable no later than March 31, 2002. (Id.)  Capitol First also issued 10 million shares of stock to PILP on or about October 15, 2001.  (Id.)

---

[2]  The Court will refer to Bloom and Richardson as the "Boca Group."

2

Todd contacted defendant Edward Durante to assist him in generating cash while also stimulating the market for Capitol First stock.  (Id. at ¶ 16.)[3]  Todd, to initiate the scheme, agreed to provide Durante with 2 million unregistered and unrestricted shares of Capitol First stock in exchange for $300,000, payable to Todd.  (Id. at ¶ 17.)  The 2 million shares were issued by Capitol First to Todd or PILP many years earlier, and were not part of the 16 million shares Todd and PILP received in October 2001.  (Id. at ¶ 18.)  Todd and Durante allegedly planned to have Durante cause the shares to be "immediately and actively" traded to promote the appearance of an active market demand on the Over the Counter Bulletin Board ("OTC Bulletin Board").  (Id. at ¶ 20.)  This would increase the value of the stock and allow Todd to later dispose of his remaining shares at a price that would reflect this artificially increased value.  (Id.)

Todd instructed Capitol First's stock transfer agent, OMS, a corporation with offices in New Jersey, to cancel PILP's 2 million restricted shares.  (Id. at ¶¶ 11, 21.)  Todd falsely advised OMS that the restricted legend was no longer necessary and instructed OMS to (1) reissue the 2 million shares as free-trading shares (with no restrictive legend), and (2) prepare stock certificates for those shares in amounts and names specified by Durante.  (Id.

---

[3]  Durante is serving 121 months in federal prison, after entering a plea of guilt to securities fraud charges.  (2d Am. Compl., at ¶ 9.)  Durante used an alias, Ed Simmons, to perpetuate the alleged scheme.  (Id.)

at ¶ 21.)  OMS prepared stock certificates in the name of a
foreign national ("Foreign National") and fictitious names over
whose shares and accounts the Foreign National and Durante would
exercise complete dominion and control.  (<u>Id.</u> at ¶ 22.)

Todd then instructed OMS that Durante was to (1) have
continued control over the shares, even though none of the shares
were issued in Durante's name, and (2) be given the courtesy of
permitting him to call for a certificate to be changed, issued,
or the like.  (<u>Id.</u> at ¶ 23.)  OMS allegedly "acquiesced" to
Todd's instructions and permitted Durante to control the issuance
of shares because it was "incentivized by its own receipt or the
receipt by its affiliates or principals, including . . . Troster,
of 100,000 Capitol First shares for no consideration other than
its facilitation of the scheme that would increase the value of
its newly-acquired 100,000 shares."  (<u>Id.</u>)  OMS also permitted
Durante to personally pick up certificates that were not issued
in his name from its offices.  (<u>Id.</u>)

Ryan, a KSI employee, acted as the broker for the Foreign
National and various accounts for the fictitious names, despite
knowing that the Foreign National and Durante controlled the
accounts.  (<u>Id.</u> at ¶¶ 7, 24.)[4]  Ryan was also a stock broker for
Christopher Brown.  (<u>Id.</u> at ¶ 7.)  Ryan "enticed" Brown to take
part in the scheme by promising Brown 25,000 free Capitol First

---

[4]  KSI is a brokerage firm and NASD member.  (<u>Id.</u> at ¶ 8.)

4

shares from KSI on or about October 30, 2001.  (Id. at ¶¶ 7, 25.)
Brown also authorized additional purchases of Capitol First stock.
On many occasions, Ryan credited the monies recognized from the
sales to Brown and others to the Foreign National's accounts.
(Id. at ¶ 25.)  Ryan received cash and Capitol First shares as
part of his compensation and for his participation.  (Id. at ¶ 26.)

Brown participated in numerous telephone conversations with
Ryan, Durante, and the Foreign National, including one in or
around late December 2001, in which he agreed to authorize Ryan
to establish an additional account.  (Id. at ¶ 27.)  Brown would
fund this account with approximately $1 million for the purpose
of, inter alia, further funding and perpetuating the manipulation
scheme in Capitol First stock.  (Id.)

Durante and the Foreign National directed the trading
activity.  (Id. at ¶ 28.)  They controlled the movement of the
shares by using Ryan to transact the various trades they wanted
to occur.  (Id.)  Brown also controlled part of the movement of
shares through the scheme by using (1) Ryan, and (2) an account
or accounts outside of the Ryan/KSI accounts held by another
brokerage firm.  (Id.)

The trading activity volume in or about early or mid December
2001 — the height of the manipulation scheme — reached hundreds
of thousands and even over a million shares traded per day.  (Id.
at ¶ 30.)  At this time, Capitol First stock traded at or about
90 or 95 cents per share.  (Id.)  After the stock price fell

significantly on or about December 20, 2001, Todd and PILP — at Durante's request — infused additional shares into the scheme by having OMS cancel 9 restricted stock certificates held by PILP totaling 851,589 shares.  (Id. at ¶ 31.)  The 851,589 shares were shares that PILP had held for many years and not the shares Capitol First granted to Todd and PILP in October 2001.  (Id. at ¶ 32.)  Todd agreed to transfer these shares into the scheme for no immediate consideration, and instead received a promise of future payment and the scheme's perpetuation.  (Id.)

On the same date that OMS cancelled the 851,589 restricted PILP shares, Todd — in his capacity as PILP's agent — requested OMS issue numerous "free" certificates totaling 851,589 shares in the names of various individuals and entities.  (Id. at ¶ 33.) These new certificates were "picked up by Ed Simmons," Durante's alias.  (Id.)  Brown is listed as the recipient of 400,000 of these shares.  (Id.)  Each of the remaining individuals and entities receiving the other shares were "a nominee for or otherwise controlled by" Durante and the Foreign National.  (Id.)

Brown initially gave the certificate for 400,000 shares to KSI for deposit into his account.  (Id. at ¶ 34.)  Brown sought return of the certificate from KSI in or about late December 2001. (Id.)  Brown, via letter dated December 27, 2001, stated that the 400,000 share certificate had not been requested by him, and indicated that it was received "as a result of efforts by . . .

6

[KSI employees], via a Mr. Ed Durant (a/k/a Simmons, a/k/a Ed Durante) to appease me."  (Id.)

Todd was actively negotiating with Boca Group for a sale or exchange of Todd's controlling shares in Capitol First during the alleged stock manipulation scheme.  (Id. at ¶ 35.)  The alleged scheme assisted the negotiations, as the Boca Group relied on the appearance of an active market for Capitol First stock, and the price at which the stock was trading, in the negotiations.  (Id.)

Todd and PILP transferred 400,000 shares (that had been returned to him or PILP by Brown in December 2001), along with additional shares, to a stock brokerage firm called "Scudbusters" in or about March 2002.  (Id. at ¶ 36.)  The principal of Scudbusters is Steve Telsey.  (Id.)  The "large block" of stock "had improperly been provided to Telsey and Scudbusters in an ongoing and improper scheme to continue to create the appearance of active trading, liquidity, and volume in Capitol First stock up to at least the time of closing the Boca Group transaction." (Id. at ¶ 37.)

Todd and PILP, by contract dated April 26, 2002, transferred 16 million shares of Capitol First stock to BFC ("Stock Exchange Agreement").  (Id. at ¶ 5.)  The 16 million shares represented 64.6% of the outstanding stock of Capitol First.  (Id.)  As part of the Stock Exchange Agreement, (1) Todd and PILP were granted a (a) 30% membership in BFC, and (b) 1/3 interest in BFC's general

7

partner, ACG, and (2) ACG received a 10% membership interest in BFC. (<u>Id.</u>)  Todd also purported to disclose a grant of 600,000 shares of Capitol First common stock to Telsey — as an "attorney to the Corporation" — under the employee stock option plan. (<u>Id.</u> at ¶ 37.)[5]  When the Stock Exchange Agreement closed on or about June 2002, Todd had not disclosed that he had sold almost 100% of his Capitol First stock (other than the 16 million shares that served as consideration for the transaction) in the months leading to the agreement. (<u>Id.</u> at ¶¶ 37-38.)

The Boca Group and those managing BFC through ACG investigated Todd and PILP's stock trading activities after gaining control in Capitol First and learning of potential improprieties. (<u>Id.</u> at ¶ 39.)  Todd, due to the investigation and pressure from the Boca Group and BFC participants, filed a Form 4 with the Securities and Exchange Commission ("SEC") in August 2004. (<u>Id.</u> at ¶ 40.)  The Form 4 acknowledged (1) Todd and PILP's acquisition in October 2001 of the 16 million shares Capitol First granted to them, and (2) Todd's disposition of the 2 million older PILP shares on October 18, 2001. (<u>Id.</u>)  The Form 4 indicated that Todd received only $.0375 per share for disposing of his 2 million PILP shares, for a total price of $75,000. (<u>Id.</u>)  However, Todd had listed this transaction in an earlier Form 4 filing as having been made

---

[5] The plaintiffs allege that Telsey is not an attorney. (2d Am. Compl., at ¶ 37.)  Instead, Telsey is a stock broker who had lost his brokerage license. (<u>Id.</u>)

for $.15 per share, for a total of $300,000.  (Id.)  Todd also, for the first time in August 2004, partially disclosed in a Form 4 the 851,589 shares that PILP infused into the manipulation scheme on or about December 20, 2001.  (Id.)  The Form 4 indicated that Todd disposed of (1) 450,000 shares on December 20, 2001, and (2) 400,000 shares on March 5, 2002.  (Id.)

The Boca Group and those managing BFC through ACG decided to remove Todd as an incumbent director and Chairman of Capitol First.  (Id. at ¶ 42.)  The board of directors of Capitol First ("Board") asked Todd to resign by letter dated September 1, 2004, and also orally asked him to resign.  (Id.)  However, Todd told the Board that he would not resign.  (Id.)  The stockholders, including BFC, removed Todd from the Board through a "Written Consent."  (Id. at ¶ 43.)  The Written Consent was executed on or about September 17, 2004, by 70.9% of the shareholders.  (Id.)  Todd was removed as a director effective at the close of business on November 8, 2004.  (Id. at ¶ 44.)

The plaintiffs brought this action on December 30, 2004.[6]  Brown moved to dismiss, stay, or transfer the action to the United States District Court for the Western District of North Carolina on February 22, 2005. (Dkt. entry no. 6.)[7]  Todd and

---

[6] Telsey and Brown were included as defendants.  (Compl.)

[7]  Brown brought an action against Durante, Capitol First, PILP, and Todd in North Carolina.  (Dkt. entry no. 6, Brown's Br., at 5.)

9

PILP also moved to transfer the case to the Western District of
North Carolina on April 8, 2005.  (Dkt. entry no. 19.)  Ryan,
Brown, KSI, and OMS separately moved to dismiss the complaint.
(Dkt. entry nos. 23, 25, 26, & 29.)  The plaintiffs filed an
amended complaint on May 23, 2005.  (Dkt. entry no. 31.)[8]

Todd, PILP, KSI, Ryan, Brown, and OMS then moved to dismiss
the amended complaint.  (Dkt. entry nos. 38-42.)  The Court denied
those motions without prejudice in November 2005.  (Dkt. entry
no. 54.)  The Court noted that (1) the plaintiffs settled their
dispute with, and had withdrawn the claims against, Brown in the
case, and (2) the North Carolina action had been dismissed in its
entirety.  (Id.)  The Court, in light of the settlement with
Brown, ordered the plaintiffs to amend the complaint.  (Id.)  On
December 28, 2005, the plaintiffs filed a second amended complaint
(dkt. entry no. 55), which includes the following counts:

(1)  Violation of 15 U.S.C. § 78p (Capitol First v. Todd
     and PILP);

(2)  Violation of 15 U.S.C. § 78p (Capitol First v.
     Durante and Ryan);

(3)  Violation of 15 U.S.C. § 78p (Capitol First v.
     Todd, PILP, Durante, and Ryan);

(4)  Breach of officer/director's fiduciary duties
     (Capitol First v. Todd);

(5)  Breach of controlling shareholder's fiduciary duty
     (Capitol First v. Todd and PILP);

(6)  Equitable indemnification (Capitol First v. Todd
     and PILP);

---

[8]  The amended complaint added Troster as a defendant.

10

(7)  Contribution (Capitol First v. Todd and PILP);

(8)  Conspiracy (Capitol First v. Todd, PILP, Durante, and Ryan);

(9)  Aiding and abetting breach of fiduciary duty (Capitol First v. Durante);

(10) Equitable indemnification (Capitol First v. Durante);

(11) Contribution (Capitol First v. Durante);

(12) Aiding and abetting breach of fiduciary duty (Capitol First v. Ryan and KSI);

(13) Equitable indemnification (Capitol First v. Ryan);

(14) Contribution (Capitol First v. Ryan and KSI);

(15) Negligence (Capitol First v. KSI);

(16) Negligence (Capitol First v. OMS);

(17) Breach of contract (Capitol First v. OMS);

(18) Aiding and abetting breach of fiduciary duty (Capitol First v. OMS);

(19) Conspiracy (Capitol First v. Todd and PILP);

(20) Breach of contract (Boca Group and BFC v. Todd and PILP);[9]

(21) Fraudulent inducement (Boca Group v. Todd and PILP);

(22) Negligent misrepresentation (Boca Group v. Todd and PILP);

(23) New Jersey RICO (Capitol First v. Ryan and Todd);

(24) New Jersey RICO conspiracy (Capitol First v. Ryan and Todd).

Todd and PILP, OMS and Troster, Ryan, and KSI separately moved to dismiss the second amended complaint. (Dkt. entry nos. 60-64.) The Court heard oral argument on June 9, 2006. (Unnumbered dkt. entry after dkt. entry no. 74.)

---

[9]  The second amended complaint lists this count as Count "XXI". It should be designated as Count "XX". The Court will refer to this count as Count XX herein.

## DISCUSSION

### I.   Standard Of Review For A 12(b)(6) Motion

A complaint may be dismissed for "failure to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6).  The Court must accept as true all of the factual allegations in the complaint, and draw all reasonable inferences in favor of the plaintiff, on a motion to dismiss.  Doe v. Delie, 257 F.3d 309, 313 (3d Cir. 2001).  But a court need not credit "bald assertions" or "legal conclusions" when deciding a motion to dismiss.  In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1429-30 (3d Cir. 1997).  Dismissal "under Rule 12(b)(6) is appropriate only if it appears beyond doubt that the plaintiff can prove no set of facts in support of [the] claim upon which relief may be granted." Jakomas v. McFalls, 229 F.Supp.2d 412, 419 (W.D. Pa. 2002).

The Court, when addressing a motion to dismiss, may generally not "consider matters extraneous to the pleadings." Burlington Coat, 114 F.3d at 1426.  But if the Court exercises discretion and permits a party to present matters outside the pleadings, the Court must (1) convert the motion into one for summary judgment, and (2) allow the parties a reasonable opportunity to present all material pertinent to such a motion under Rule 56.  Fed.R.Civ.P. 12(b).  An exception to this rule is that the Court may consider (1) exhibits attached to the complaint, (2) matters of public record, and (3) all documents that are integral to or explicitly relied upon in the complaint without converting the motion into

one for summary judgment.  Angstadt v. Midd-West Sch. Dist., 377 F.3d 338, 342 (3d Cir. 2004).[10]

Todd and PILP, in moving in part under Rule 12(b)(6), attach a copy of a January 14, 2002 Form 4 filed by Todd.  As the Form 4 is a matter of public record, the Court will consider the document for purposes of this motion.  OMS and Troster, however, rely on materials beyond the allegations of the second amended complaint, including, inter alia, (1) Troster's March 21, 2006 declaration (not executed); (2) Todd's October 17, 2001 letter to Troster (with attached copy of stock certificates); (3) an October 18, 2001 letter (legal opinion) from Fredrick Franke, Esq. to Troster; (4) Todd's "transaction journal"; (5) Todd's December 20, 2001 letter to OMS; (6) a copy of instructions OMS received allegedly directing the issuance of Capitol First shares; (7) a December 20, 2001 letter (legal opinion) from Franke to Troster; (8) Resolutions of Appointment as Transfer Agent and Registrar; (9) OMS's Documentation, Regulations, and Procedures Pamphlet; and (10) an April 10, 2006 declaration of Joel S. Schneck, Esq. and fully executed March 21, 2006 declaration of Troster.  (Dkt. entry nos. 61 & 71.)  The Court will not consider these

---

[10]  "The rationale underlying this exception is that the primary problem raised by considering documents outside the complaint — lack of notice to the plaintiff — is dissipated where the plaintiff has actual notice and has relied upon the documents in framing the complaint."  Jones v. Intelli-Check, Inc., 274 F.Supp.2d 615, 625-26 (D.N.J. 2003).

additional documents submitted by these defendants because they constitute evidence outside of the second amended complaint, and are neither relied upon by the plaintiffs, nor integral to the second amended complaint.  The Court also declines, in light of the absence of discovery in the case, to convert OMS and Troster's motion into a motion for summary judgment.

## II.  Standard Of Review For A 12(b)(1) Motion

A defendant may move to dismiss under Rule 12(b)(1) if the complaint does not allege sufficient grounds to establish subject matter jurisdiction on its face (a "facial attack").  <u>Mortensen v. First Fed. Sav. & Loan Assoc.</u>, 549 F.2d 884, 891 (3d Cir. 1977).  The Court considers a facial attack under the same standard as a motion to dismiss under Rule 12(b)(6) and, as such, "assume[s] that the [well-pleaded] allegations contained in the complaint are true."  <u>Cardio-Med. Assocs. Ltd. v. Crozer-Chester Med. Ctr.</u>, 721 F.2d 68, 75 (3d Cir. 1983).  Also, the Court may dismiss the complaint in a facial attack "only if it appears to a certainty that the plaintiff will not be able to assert a colorable claim of subject matter jurisdiction."  <u>Iwanowa v. Ford Motor Co.</u>, 67 F.Supp.2d 424, 438 (D.N.J. 1999).

A defendant may also challenge subject matter jurisdiction by factually contesting the plaintiff's allegations of its existence (a "factual attack").  <u>Id.</u>  The Court, when considering a factual attack to subject matter jurisdiction, "may look beyond the

14

pleadings and make its own determination as to whether it has the power to hear the action." <u>Bricker v. Stouchburg Nursery & Garden Ctr.</u>, No. 03-6483, 2004 WL 1576652, at *1 (E.D. Pa. July 14, 2004). "Thus, 'no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims.'" <u>Iwanowa</u>, 67 F.Supp.2d at 438 (citation omitted). Moreover, the Court "may consider affidavits, depositions and testimony to resolve factual issues bearing on jurisdiction." <u>Id.</u> The plaintiff bears the burden of proving that jurisdiction exists. <u>Mortensen</u>, 549 F.2d at 891.

A Rule 12(b)(1) "factual evaluation may occur at any stage of the proceedings, from the time the answer has been served until after the trial has completed." <u>Id.</u> (explaining that "[a] factual jurisdictional proceeding cannot occur until plaintiff's allegations have been controverted"). As the defendants have not filed an answer, the Court considers this motion a facial attack. Thus, the Court will only analyze the allegations in the complaint and not consider the additional documents provided by the parties as described <u>supra</u> in resolving the motion.

## III. Section 16 Claims

Capitol First alleges that Todd, PILP, Durante, and Ryan violated section 16 of the Securities Exchange Act of 1934 ("1934 Act"), 15 U.S.C. § 78p ("Section 16"). (2d Am. Compl., at 15-19.)

15

It claims that, <u>inter alia</u>, (1) Todd and PILP failed to disclose or accurately disclose their short-swing transactions of Capitol First stock, (2) Todd, PILP, Durante, Ryan, Brown, and the Foreign National constituted a "group" pursuant to Section 13(d) of the 1934 Act, (3) Durante, Ryan, Brown, and the Foreign National constituted a group under Section 13(d), and (4) these groups received improper short-swing profits from their transactions in Capitol First stock.  (<u>Id.</u>)

Todd and PILP argue that the Court should dismiss the Section 16(b) claims against them because, <u>inter alia</u>, (1) any purchase and sale occurred outside the 6-month period, (2) they did not realize a profit from any sale, (3) the claim is barred by the two-year statute of limitations, and (4) they were not part of a "group" under Section 13(d).  (Todd & PILP Br. ("TP Br.").)[11] Ryan contends that (1) Capitol First has failed to set forth sufficient facts that (a) Ryan was a member of any "group" or the beneficial owner of any Capitol First stock, and (b) a short-swing transaction occurred, and (2) the claim is time-barred.

### A.   Section 16(b) — Generally

Section 16(b) provides that to prevent:

the unfair use of information which may have been
obtained by such beneficial owner, director, or officer

---

[11]  Todd and PILP assert that insofar as Capitol First has alleged a Section 16(a) violation, this section does not provide for a private right of action.  (TP Br., at 2-3.)  Capitol First states that it does not assert such a claim.  (Pl. Opp. to TP Br., at 23-24.)  Thus, Todd and PILP's argument is moot.

> by reason of his relationship to the issuer, any profit
> realized by him from any purchase and sale, or any sale
> and purchase, of any equity security of the issuer . .
> . within any period of less than six months . . . shall
> inure to and be recoverable by the issuer, irrespective
> of any intention on the part of such beneficial owner,
> director, or officer in entering into such transaction.

15 U.S.C. § 78p(b).  Those profiting from purchases and sales made

within 6 months of each other are thus strictly liable.  Magma

Power Co. v. Dow Chem. Co., 136 F.3d 316, 320 (2d Cir. 1998).

"No showing of actual misuse of inside information or of unlawful

intent is necessary to compel disgorgement."  Id.  To allege a

claim under Section 16(b), there must be "(1) a purchase and (2)

a sale of securities (3) by an officer or director of the issuer

or by a shareholder who owns more than ten percent of any one

class of the issuer's securities (4) within a six-month period."

Levy v. Sterling Holding Co., 314 F.3d 106, 111 (3d Cir. 2002).

These claims are subject to a two-year statute of limitations.

15 U.S.C. § 78p(b).

## B.  Allegations of a Short-Swing Sale

### 1.  "Purchase" and "Sale" Within Six-Month Period

Todd and PILP contend that Capitol First has failed to

adequately allege that the purchase and sale of Capitol First

shares occurred within a 6-month period.  (TP Br., at 3-6.)  Todd

and PILP point out that the second amended complaint states that

the (1) "2 million shares that became the foundation for the stock

manipulation scheme . . . had been issued by the Company many years

earlier," and (2) 851,589 shares were cancelled and reissued.

17

(<u>Id.</u> at 5.)  Moreover, Todd and PILP argue that any sale would have occurred more than 6 months from Todd and PILP's last purchase.  (<u>Id.</u> at 6.)

Capitol First claims that "Section 16(b) does not require the tracing and matching of individual shares to determine whether the same share of stock was both bought <u>and</u> sold within six months." (Pl. Opp. to TP Br., at 16 (emphasis in original).)  It contends that the second amended complaint identifies a number of purchases and sales by Todd and PILP between October 2001 and March 2002. (<u>Id.</u> at 18.)

The Court finds that Capitol First has sufficiently alleged that Todd and PILP purchased and sold shares of its stock within a six-month period to maintain a Section 16(b) action.  Although Capitol First has slightly confused the analysis by referring to the "foundation of the stock manipulation scheme" as the two million shares held by Todd and PILP many years earlier, it has alleged purchases and sales — from October 2001 through March 2002 — to withstand a motion to dismiss.

## 2.  **Profit**

Todd and PILP argue that Capitol First has failed to allege that they profited from the short-swing transaction.  (<u>Id.</u> at 6.) They state that, if anything, Capitol First's allegations (and attached Form 4s) show that they sold the Capitol First shares at a loss.  (<u>Id.</u> at 6-7.)  Also, during oral argument, Todd and PILP

18

provided the Court with a explanation of Todd's Form 4s (including Todd's amended Form 4 filed in August 2004).  Capitol First contends that it has included sufficient allegations in the second amended complaint that Todd and PILP (1) did realize short-swing profits, and (2) concealed those profits by (a) filing false Form 4s, and (b) "netting" multiple separate transactions to offset the profits they realized.  (Pls. Opp. to TP Br., at 19.)

The Court finds that Capitol First has sufficiently alleged that Todd and PILP received a short-swing profit from their purchases and sales of Capitol First stock.  The Court — although recognizing the detailed explanation of the Form 4s provided by the defendants during oral argument, including how to read the forms — cannot engage in the type of interpretation (including resolving the obvious factual issues) needed to properly analyze the accuracy of the Form 4s in deciding a motion to dismiss.

### C.   Section 16 "Group"

Capitol First has alleged violations of Section 16(b) by two separate "groups".  The first alleged group is described in Count II as Durante, Ryan, Brown, and the Foreign National.  (2d Am. Compl., at ¶ 54.)  The second alleged group is denoted in Count III as consisting of Todd, PILP, Durante, Ryan, Brown, and the Foreign National.  (Id. at ¶ 61.)

### 1.   "Group" Liability Under Section 16(b) - Generally

Liability under Section 16(b) attaches to beneficial owners owning more than 10% of any class of securities.  17 C.F.R. §

240.16a-1 ("Rule 16a-1(a)(1)").  Rule 16a-1(a)(1) clarifies how to identify a beneficial owner, stating: "the term 'beneficial owner' shall mean any person who is deemed a beneficial owner pursuant to Section 13(d) [("Section 13(d)")] of the [Securities Exchange] Act and the rules thereunder."  Id.  Section 13(d)(3) provides that, inter alia, "[w]hen two or more persons act as a partnership, limited partnership, syndicate, or other group for the purpose of acquiring, holding, or disposing of securities of an issuer, such syndicate or group shall be deemed a 'person' for the purposes of this subsection."  15 U.S.C. § 78m(d)(3).  To implement Section 13(d)(3), the SEC promulgated Rule 13d-5.  See Morales v. Quintel Entm't, Inc., 249 F.3d 115, 123 (2d Cir. 2001).  Rule 13d-5 defines beneficial ownership by a "group" as follows:

> When two or more persons agree to act together for the purpose of acquiring, holding, voting or disposing of equity securities of an issuer, the group formed thereby shall be deemed to have acquired beneficial ownership, for purposes of sections 13(d) and (g) of the Act, as of the date of such agreement, of all equity securities of that issuer beneficially owned by any such persons.

17 C.F.R. § 240.13d-5(b)(1) (2006).

### 2.   Allegations of "Group" as to Todd and PILP

Capitol First alleges that Todd, PILP, Durante, Ryan, Brown, and the Foreign National constituted a "group" under Section 13(d).  (2d Am. Compl., at ¶ 61.)  Capitol First claims that "[p]rior to the group's formation, each of its eventual members were beneficial owners of Capitol First stock."  (Id. at ¶ 62.)

Capitol First also alleges that — from on or about October 18, 2001 through January 2002 — each of the group members was the beneficial owner, directly or indirectly, of "far in excess of 10% of the common stock of Capitol First." (Id. at ¶ 63.) Capitol First asserts that the group (1) "acted in concert in furtherance of a commonly held objective with regard to acquiring, holding, voting or disposing of Capitol First securities," and (2) received short-swing profits. (Id. at ¶¶ 64-65.)

Todd and PILP contend that Capitol First has failed to allege "any causal relationship between purchases and sales, and the 'profit.'" (TP Br., at 12.) They also argue that the second amended complaint is devoid of specific allegations relating to the shares purchased and sold by each group member. (Id. at 13.) Todd and PILP further claim that Capitol First has not alleged that (1) the factors enunciated in Section 13(d) of the 1934 Act apply to them, and (2) prior to the formation of the group, each member had been a beneficial owner of Capitol First stock. (TP Br., at 13-14; TP Reply Br., at 10-11.) Finally, Todd and PILP assert that the allegations in the second amended complaint demonstrate that the "group" did not hold 2,871,539 shares of stock. (TP Reply Br., at 11-13.)

The Court finds that Capitol First has sufficiently alleged that Todd and PILP were members of a "group" under Section 13(d). Capitol First has included allegations demonstrating that the

members of the group were beneficial owners of Capitol First stock prior to formation of the group.  Also, although Todd and PILP claim that the allegations are insufficient because they do not specify the number of shares owned by each member, the purchase and sale prices of the transactions, or when the purchases or sales occurred, they have not identified any case law or statutory requirement that Capitol First specify such allegations.

### 3.   Allegations of a "Group" as to Ryan

Capitol First alleges that Ryan, Brown, Durante, and the Foreign National constituted a "group" under Section 13(d).  (2d Am. Compl., at ¶ 54.)  Capitol First includes similar allegations as to this "group" as to the group including Todd and PILP; however, they allege that this group, by on or about December 20, 2001, was the beneficial owner of approximately 2,851,539 shares of Capitol First stock.  (Id. at ¶ 56.)  Capitol First claims that the 2,851,539 shares constituted more than 10% of the common stock of Capitol First.  (Id.)

Ryan claims that "other than the unsupported and conclusory assertion that [he] 'had full knowledge of the scheme' . . . there are simply no facts alleged which would support a claim that [he] was a participant in any group."  (Ryan Br., at 7.)  He contends that "at best" the second amended complaint alleges that he "functioned during th[e period of the alleged stock manipulation scheme] as a stock broker."  (Id. at 8.)  He also argues that the

second amended complaint does not include any allegation that he had a pecuniary interest in any of the 2,851,539 shares allegedly controlled by the group.

The Court finds that Capitol First has alleged that Ryan beneficially owned Capitol First stock and was a member of two potential "groups" under Section 13(d).  He has also failed to provide any support to his argument that Capitol First was required to specifically identify the number of shares he held or when he received such shares.  Capitol First's allegations have adequately placed Ryan on notice of the basis for its claim.

**D.   Applicability of the Statute of Limitations**

Todd, PILP, and Ryan assert that the Section 16(b) claims are barred by a two-year statute of limitations.  (TP Br., at 7-12; Ryan Br., at 12-13.)  Todd and PILP claim that equitable tolling is not available in a Section 16(b) action.  (TP Br., at 8.)  Todd and PILP also argue that, even if the equitable tolling doctrine applies, Capitol First has failed to plead with specificity the facts supporting concealment by fraud in compliance with the Private Securities Litigation Reform Act and Rule 9 of the Federal Rules of Civil Procedure.  (Id.)  Todd, PILP, and Ryan further claim that Capitol First had notice of any alleged short-swing profit as early as Todd's filing of a Form 4 on January 14, 2002, but, in any event, no later than the closing of the Stock Exchange Agreement in June 2002.  (TP Br., at 9-12; Ryan Br., at 12-13.)

23

Capitol First argues that the two-year statute of limitations applicable to Section 16(b) actions should be equitably tolled. (Pl. Opp. to TP Br., at 9-15.)  Capitol First contends that the Court should follow the Courts of Appeals for the Second and Ninth Circuits in concluding that "the failure to file a Form 4 in accordance with Section 16(a) tolls Section 16(b)'s two-year limitations period until the plaintiff receives 'actual notice' that a person subject to Section 16(a) realized 'short-swing profits.'" (Id. at 12.)  Capitol First points out that, although Todd and PILP collectively (1) received 16 million shares of Capitol First stock in October 2001, and (2) sold 851,589 shares in December 2001, Todd did not file a Form 4 disclosing this sale until his amended Form 4 in August 2004.  (Id. at 13.)  Thus, Capitol First argues that Section 16(b)'s two-year statute of limitations did not begin to run until August 2004.  (Id.)

Capitol First asserts that the argument that it knew of the short-swing transaction because it (1) had access to the transfer records, and (2) must be charged with the knowledge of what appears in its stock ledger and transfer books, lacks merit. (Id. at 13-14.)  Capitol First claims that this would provide only "constructive knowledge," which is insufficient to start the limitations period.  (Id. at 14.)  Further, Capitol First states that "to the extent Todd and [PILP rely] upon earlier Form 4 filings[, such as the January 14, 2002 Form 4], plaintiffs

24

specifically allege that these Form 4 were false and/or misleading so as to continue to toll the statute of limitations." (Id. at 14-15.)

Capitol First contends that Ryan's failure to file any Form 4 tolls the statute of limitations. (Pls. Br. in Opp. to Ryan's Motion to Dismiss, at 19-22.) Capitol First notes that it alleged that Ryan, as a member of a group, was required to file his own Form 4 with the SEC. (Id. at 20-21.) Capitol First argues that Todd's filing of a Form 4 in January 2002 would not provide it with notice of any short-swing profits realized by Ryan. (Id. at 21.) Moreover, Capitol First points out that any issues as to what notice Capitol First had of Ryan's short-swing profits relate to factual issues "that cannot be decided at the pleadings stage." (Id. at 22.)

The Court notes that the second amended complaint alleges that the last short-swing sale by Todd and PILP occurred in March 2002. The plaintiffs did not file a complaint until December 30, 2004. As such, unless equitable tolling applies to allow the plaintiffs to avoid Section 16(b)'s limitations period, the claim cannot proceed.[12]

"[E]quitable tolling is '[t]he doctrine that the statute of limitations will not bar a claim if the plaintiff, despite

---

[12] Capitol First essentially concedes that it did not file a complaint within the applicable two-year statute of limitations. (2d Am. Compl., at ¶ 52.)

diligent efforts, did not discover the injury until after the limitations period had expired.'" Luntungan v. Att'y Gen., 449 F.3d 551, 557 (3d Cir. 2006) (citation omitted). Also, the tolling of a statute of limitations due to "fraudulent concealment" is an "equitable doctrine [that] is read into every federal statute of limitations." Holmberg v. Armbrecht, 327 U.S. 392, 397 (1946). Although the Third Circuit has not addressed the issue, the Second and Ninth Circuits have held that equitable tolling applies to a Section 16(b) claim. Litzler v. CC Invs., 362 F.3d 203, 205 (2d Cir. 2004); Whittaker v. Whittaker Corp., 639 F.2d 516, 528 (9th Cir. 1981). But see Carr-Consol. Biscuit Co. v. H.S. Moore, 125 F.Supp. 423 (M.D. Pa. 1954) (declining to toll limitations period in action to recover short-swing profits). The Court follows the decisions of the Second and Ninth Circuits in applying equitable tolling to Capitol First's Section 16(b) claim.

The Court further finds that Capitol First has sufficiently alleged a claim for equitable tolling of the statute of limitations. The defendants' contentions that Capitol First had notice and knowledge of the short-swing transactions before August 2004 raise disputed factual issues that the Court cannot resolve on a motion to dismiss.

## IV.  State Law Claims

### A.  Equitable Indemnity

Capitol First, in Counts VI and XII, alleges that it is entitled to equitable indemnification from Todd, PILP, Durante,

26

and Ryan, because it was named as a defendant in Brown's North Carolina action, and "there is a risk that it may be named in additional lawsuits, investigations, or claims."  (2d Am. Compl., at 23-24, 26, & 28.)  Capitol First alleges that Todd, PILP, Durante, and Ryan were acting personally, and not with or for Capitol First.  (Id. at 23, 26, & 28.)  Capitol First seeks equitable indemnity "for payment of monies in judgment or in settlements with respect to this lawsuit, the Brown lawsuit, and any other claims or investigations that might ensue from Todd and [PILP's] misconduct."  (Id. at 24, 26, 28.)

Equitable indemnity is "an equitable doctrine that allows a court to shift the cost from one tortfeasor to another.  The right to common-law indemnity arises 'without agreement, and by operation of law to prevent a result which is regarded as unjust or unsatisfactory.'"  Harley Davidson Motor Co. v. Advance Die Casting, 696 A.2d 666, 670-71 (N.J. 1997) (citation omitted).  The party seeking indemnification must "have been without fault and his liability must be merely constructive, secondary or vicarious in order to make a claim for indemnification.  Where a tortfeasor secures indemnification from another jointly liable tortfeasor, the result is that the indemnitor becomes liable for the full damages of the injured party."  New Milford Bd. of Educ. v. Juliano, 530 A.2d 43, 45 (N.J. App. Div. 1987); see Stephenson v. R.A. Jones & Co., 510 A.2d 1161, 1163 (N.J. 1986) (concluding

27

party could not maintain claim for equitable indemnification where party was 5% responsible for alleged injury, even though opposing party was responsible for 95% of harm).

The Court finds that the second amended complaint pleads a claim of equitable indemnification against Todd, PILP, and Ryan.[13]

**B.    Contribution**

Capitol First, in Counts VII and XIV of the second amended complaint, asserts claims against Todd and PILP, and Ryan and KSI, respectively.  Capitol First, similar to the claim for equitable indemnification, point out that it (1) settled the litigation with Brown, and (2) paid in excess of its proportionate share of liability to Brown.  (2d Am. Compl., at 24, 29.)

The New Jersey Joint Tortfeasors Contribution Act defines "joint tortfeasors" as "two or more persons jointly or severally liable in tort for the same injury to person or property," and allows a joint tortfeasor to "recover contribution from [any] other joint tortfeasor or joint tortfeasors for the excess paid over his pro rata share."  N.J.S.A. § 2A:53A-1, A-3.  Its purpose is to establish a "right of joint tortfeasors to seek allocation among themselves of the burden of their fault."  Markey v. Skog,

___

[13]  The plaintiffs, in their opposition brief to Todd and PILP's motion to dismiss, claim that Nevada law applies to Capitol First's equitable indemnity claim against Todd and PILP. The Court need not address the choice of law issues at this juncture, but finds that the plaintiffs' allegations would be sufficient to assert a claim under New Jersey and Nevada law.

322 A.2d 513, 517 (N.J. Law Div. 1974).[14]  The Court finds that
the second amended complaint pleads a claim of contribution
against Todd and PILP, and Ryan and KSI.

### C.   Fraudulent Inducement

Boca Group, in Count XXI of the second amended complaint,
asserts a claim of fraudulent inducement against Todd and PILP.
Boca Group alleges that Todd and PILP "knowingly and intentionally
made numerous false statements of material fact to [it] during
the negotiation period, and up through the execution of the Stock
Exchange Agreement in April, 2002, the due diligence period, and
the time of closing in June, 2002."  (2d Am. Compl., at ¶ 161.)[15]
Boca Group claims that (1) Todd and PILP knew the statements were
false and misleading when made, (2) it relied on the false and
misleading information, and (3) it justifiably relied on the
statements to its detriment and damage.  (Id. at ¶¶ 162-64.)

A fraud claim must assert: (1) a material misrepresentation
of an existing or past fact; (2) knowledge of the falsity by the
person making the misrepresentation; (3) intent that it will be
relied on; (4) reliance on the misrepresentation; and (5)
resulting damages.  Napp v. Anschelewitz, Barr, Ansell &
Bonnello, 477 A.2d 1224, 1232 (N.J. 1984).  "Fraud requires clear

---

[14]  Capitol First also claims that it is entitled to
contribution based on common law principles.

[15] The second amended complaint lists some of the false and
misleading information provided by the defendants to Boca Group.
(2d Am. Compl., at ¶ 161.)

and convincing proof." <u>Fox v. Mercedes-Benz Credit Corp.</u>, 658
A.2d 732, 736 (N.J. App. Div. 1995).  "Thus, in a case of
fraudulent inducement, a plaintiff must convincingly show that
there was an intentional material misrepresentation of fact and
that the plaintiff reasonably relied on that fact to [the
plaintiff's] detriment." <u>Horton v. Ross Univ. Sch. Of Med.</u>, No.
04-5658, 2006 WL 1128705, at *10 (D.N.J. Mar. 30, 2006).

The Court finds that the second amended complaint adequately
and particularly pleads a claim of fraudulent inducement against
Todd and PILP.

**D.   Negligent Misrepresentation**

Boca Group asserts a claim against Todd and PILP for
negligent misrepresentation in Count XXII.  Boca Group relies on
the allegations of misrepresentations in the fraudulent inducement
count to support a claim of negligent misrepresentation.  (2d Am.
Compl., at ¶ 166.)  Boca Group also claims that Todd and PILP
misrepresented "the supposed nonpayment of expenses that resulted
in improper double payments for the same supposed expenses." (<u>Id.</u>)

To assert a claim of negligent misrepresentation, a plaintiff
must allege an "incorrect statement, negligently made and
justifiably relied upon [causing] economic loss or injury sustained
as a consequence of that reliance." <u>H. Rosenblum, Inc. v. Adler</u>,
461 A.2d 138, 142-43 (N.J. 1983).  The Court finds that Boca Group
has sufficiently alleged a claim of negligent misrepresentation.

30

### E.   Aiding and Abetting Breach of Fiduciary Duty

Capitol First, in Counts XII and XVIII of the second amended complaint, alleges that Ryan and KSI, and OMS and Troster, aided and abetted Todd and PILP in breaching their fiduciary duties to Capitol First and its shareholders.

To be found liable for aiding and abetting a breach of fiduciary duty, a defendant must (1) know that the other's conduct constituted such a breach, and (2) substantially assist or encourage the other in committing that breach.  See Bd. of Trs. of Teamsters Local 863 Pension Fund v. Foodtown, Inc., 296 F.3d 164, 174 (3d Cir. 2002) (discussing elements in context of ERISA action); see also Morganroth & Morganroth v. Norris, McLaughlin & Marcus, P.C., 331 F.3d 406, 415 (3d Cir. 2003) ("The elements of aiding and abetting are: (1) the commission of a wrongful act; (2) knowledge of the act by the alleged aider-abettor; and (3) the aider-abettor knowingly and substantially participated in the wrongdoing.").  The Court finds that Capitol First has properly alleged a claim for aiding and abetting breach of fiduciary duty against Ryan and KSI, and OMS and Troster.

### F.   Negligence

Capitol First alleges that KSI and OMS were negligent.  (2d Am. Compl., at 29-31.)  Capitol First asserts that KSI (1) owed a duty to Capitol First and its shareholders to exercise reasonable care consistent with its credentials in engaging in its trading

31

activity, (2) failed in its duty to exercise reasonable case, and (3) proximately caused Capitol First to suffer damages.  (Id. at 29.)  Capitol First also alleges that it "was within an identifiable class of persons with respect to whom [KSI] knew or had reason to know was likely to suffer economic damage from its failure to exercise reasonable care."  (Id.)  Capitol First alleges that OMS (1) owed Capitol First a duty, as transfer agent, to use reasonable care in the issuance and delivery of stock, (2) failed to exercise reasonable care in connection with the stock manipulation scheme, and (3) proximately caused Capitol First to suffer damages.  (Id. at 30-31.)

A negligence action requires the following: (1) duty of care, (2) breach of duty, (3) proximate cause, and (4) actual damages.  Weinberg v. Dinger, 524 A.2d 366, 373 (N.J. 1987).  The Court finds that Capitol First has sufficiently alleged that KSI and OMS were negligent.

### G.  Common Law Conspiracy

Capitol First asserts conspiracy claims in Counts VIII and XIX of the second amended complaint.  In Count VIII, Capitol First claims that Todd, PILP, Durante, and Ryan, along with the Foreign National, conspired to, inter alia, violate Section 16(b).  In Count XIX, Capitol First alleges that Todd, PILP, and Telsey conspired to (1) manipulate the price of Capitol First stock, (2) violate Section 16(b), and (3) further Todd and PILP's fraudulent misrepresentations to Boca Group.

A civil conspiracy is "a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damage." Banco Popular N. Am. v. Gandi, 876 A.2d 253, 263 (N.J. 2005). "It is enough [for liability] if you understand the general objectives of the scheme, accept them, and agree, either explicitly or implicitly, to do your part to further them." Id. "Most importantly, the gist of the claim is not the unlawful agreement, but the underlying wrong which, absent the conspiracy, would give a right of action." Id. (cites and internal quotes omitted).

The defendants assert that New Jersey does not recognize an independent tort of conspiracy, and the Court should dismiss the claims because the substantive allegations of "wrongs" lack merit. (TP Br., at 17-18; Ryan Br., at 23-24.) As the Court has found that Capitol First has set forth sufficient allegations as to its Section 16(b) and related state law claims, these claims are sufficient wrongs to support the alleged civil conspiracy claims.

### H.   New Jersey RICO Claims

Capitol First alleges that Ryan and Todd violated sections 2C:41-2c ("Section c") and 2C:41-2d ("Section d") of the New Jersey Racketeer Influenced Corrupt Organization Act ("NJRICO") in Counts XXIII and XXIV of the second amended complaint,

respectively.  Capitol First asserts that Ryan, Todd, the Foreign
National, Brown, and Wallace Giakas (a mutual acquaintance of
Brown and the Foreign National) acted as "an enterprise for the
purpose of manipulating stocks and other illicit purposes."  (2d
Am. Compl., at ¶ 170.)[16]  Capitol First alleges that Ryan and
Todd "were employed by or associated with the [enterprise], and
participated, directly or indirectly, in the conduct of the
affairs of the [enterprise] through a pattern of racketeering
activity, in violation of N.J.S.A. § 2C:41-2."  (Id. at ¶ 171.)

    The enterprise allegedly had "three illegal aims:"

    (a) to fraudulently obtain money by committing fraud in
connection with offering, purchase and sale of various
securities;

    (b) to defraud Capitol First and its shareholders and, in
turn, unlawfully enrich the defendants; and

    (c) to corruptly conceal the racketeering activity from
the SEC and other law enforcement authorities by bribing,
intimidating and harassing witnesses, and filing false
documents.

(Id. at ¶ 172.)  Also, Capitol First alleges that Ryan and Todd
engaged in a pattern of racketeering activity by violating (1)
federal mail and wire fraud statutes, (2) the New Jersey
Securities Fraud Statute, and (3) tampering with and intimidating
witnesses in violation of 18 U.S.C. §§ 1512(b) and (c).  (Id. at
¶ 173.)  Capitol First alleges that this pattern of racketeering
activity occurred from about 2000 until 2004.  (Id. at 174.)

---

[16] Capitol First alleges in Count XXIV that Ryan, Todd, the
Foreign National, Durante and others, combined and conspired to
violate NJRICO.

NJRICO provides that "[a]ny person damaged in his business or property by reason of a violation of [N.J.S.A.] § 2C:41-2 may sue" the violating party. N.J.S.A. § 2C:41-4c. To properly plead a NJRICO claim asserting a fraudulent predicate act, a party must comply with Rule 9(b), which requires that such allegations be pled with particularity. Lum v. Bank of Am., 361 F.3d 217, 223-24 (3d Cir. 2004) (citations omitted). Also, "the plaintiffs must plead with particularity the 'circumstances' of the alleged wrongdoing in order to place the defendants on notice of the precise misconduct with which they are charged." Rose v. Bartle, 871 F.2d 331, 366 (3d Cir. 1989).

Section c states that "[i]t shall be unlawful for any person employed by or associated with any enterprise engaged in or activities of which affect trade or commerce to conduct or participate, directly or indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity." N.J.S.A. § 2C:41-2c. An enterprise "includes any individual, sole proprietorship, partnership, corporation, business or charitable trust, association, or other legal entity, any union or group of individuals associated in fact although not a legal entity, and it includes illicit as well as licit enterprises and governmental as well as other entities." Id. § 2C:41-1c. Also, a "pattern of racketeering" requires "at least two acts of racketeering activity[, and a] showing that the incidents of racketeering

35

activity embrace criminal conduct that has either the same or similar purposes, results, participants or victims or methods of commission or are otherwise interrelated by distinguishing characteristics and are not isolated incidents." Id. § 2C:41-1d. "The factor of 'continuity plus relationship' between the two acts 'combines to produce a pattern.'" Mayo v. Pollack, 799 A.2d 12, 20 (N.J. App. Div. 2002) (citations omitted). "Racketeering activity" includes, inter alia, "forgery and fraudulent practices and all crimes defined in chapter 21 of Title 2C of the New Jersey Statutes[, and] fraud in the offering, sale or purchase of securities." N.J.S.A. § 2C:41-1o, p.

Section d provides that it is "unlawful for any person to conspire as defined by N.J.S. 2C:5-2, to violate any of the provisions of this section." Id. § 2C:41-2d.  A NJRICO conspiracy has two elements:

> an agreement to violate RICO and the existence of an enterprise.  The agreement to violate RICO itself has two aspects.  One involves the agreement proper, that is, an agreement to conduct or participate in the conduct of the affairs of the enterprise.  The other involves an agreement to the commission of at least two predicate acts.  If either agreement is lacking, the defendant has not embraced the objective of the conspiracy — the substantive violation of the RICO Act — that is required for any conspiracy conviction under classic conspiracy law.

State v. Ball, 661 A.2d 251, 268 (N.J. 1995).

The Court, after reviewing the allegations in the second amended complaint, finds that the allegations are sufficient (and

particularly pled) to assert claims against Todd and Ryan under Sections c and d of NJRICO.

## CONCLUSION

The Court finds that the plaintiffs have alleged cognizable claims against Todd, PILP, and Ryan under Section 16(b).  Also, the plaintiffs have set forth sufficient allegations for the application of equitable tolling to toll the running of the applicable two-year statute of limitations.  As Capitol First has set forth sufficient allegations for a claim under Section 16(b), the defendants' separate motions to dismiss, insofar as they allege that the Court should dismiss the complaint for lack of subject matter jurisdiction under Rule 12(b)(1), will be denied.

The Court further finds that the defendants have failed to show that the plaintiffs have not alleged cognizable claims against them under New Jersey law for equitable indemnification, contribution, fraudulent misrepresentation, negligent misrepresentation, aiding and abetting breach of fiduciary duty, negligence, and NJRICO.  Accordingly, the Court will deny the separate motions to dismiss.  The Court will issue an appropriate order.

                                          s/ Mary L. Cooper
                                        **MARY L. COOPER**
                                        United States District Judge